UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SHERRY L. DEGNAN,                                16-CV-197-LJV-MJR

                    Plaintiff,                   REPORT AND RECOMMENDATION

          -v-

NANCY A. BERRYHILL,[1]
Acting Commissioner of Social Security,

                    Defendant.
_____

          This case has been referred to the undersigned by the Hon. Lawrence J. Vilardo

pursuant to 28 U.S.C. §636(b)(1)(B) for the preparation of a report and recommendation

on dispositive motions.  (Dkt. No. 19).

          Plaintiff Sherry L. Degnan brings this action pursuant to 42 U.S.C. §405(g) seeking

judicial review of the final decision of the Commissioner of Social Security denying her

Social Security Disability Insurance Benefits under the Social Security Act (the "Act").

Both parties have moved for judgment on the pleadings pursuant to Rule 12(c) of the

Federal Rules of Civil Procedure.  For the following reasons, it is recommended that

Degnan's motion (Dkt. No. 20) be denied and the Commissioner's motion (Dkt. No. 23)

be granted.

---

[1]       Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is automatically substituted
for the previously named defendant Carolyn W. Colvin.  The Clerk of Court is directed to amend the caption
accordingly.

## BACKGROUND

I.     *Procedural History*

On September 16, 2010, Degnan filed an application for Disability Insurance Benefits ("DIB") alleging disability since April 1, 2010 due to chronic cervical and lumbar radiculopathy.  (*See* Tr. 80, 198-99, 255).[2]  Degnan worked as a wire transfer clerk for a bank for thirteen years but has been unemployed since 2008.  (Tr. 43, 46, 64, 898-99). Her date last insured is December 31, 2013.  (Tr. 80).  Degnan's DIB application was denied on December 15, 2010 (Tr. 80-86), after which she requested a hearing before an Administrative Law Judge (Tr. 87).   On September 5, 2014, Degnan, represented by counsel, appeared before Administrative Law Judge Donald T. McDougall (the "ALJ") for a hearing.  (Tr. 39-73).[3]  On October 3, 2014, the ALJ issued his decision denying Degnan's DIB claim.  (Tr. 15-38).  Degnan requested review by the Appeals Council (Tr. 14), but on January 6, 2016, the Appeals Council denied Degnan's request, making the ALJ's decision the final decision of the Commissioner (Tr. 1-6).  This action followed.

II.     *Summary of the Evidence*

A.  *Medical Evidence*

The Court will briefly summarize the medical evidence that is relevant to its findings and recommendations.

The medical evidence in the record dates back to 2006, when Dr. Richard Ruh, Degnan's primary care physician, noted that Degnan has chronic back and shoulder pain.

---

[2]     References to "Tr." are to the administrative record in this case.
[3]     Hearings were held before a different ALJ, Nancy L. Pasiecznik, on February 16, 2012, May 31, 2012, August 3, 2012, and February 6, 2013, but each hearing was continued to allow Degnan time to obtain representation and/or to further develop the record.  (*See* Tr. 888-968).  ALJ Pasiecznik became unavailable after the February 6, 2013 hearing, resulting in the case being reassigned to ALJ McDougall.

Degnan had been in two motor vehicle accidents, one in 1996 and the other in 2003.  (Tr. 583-84).[4]  Prior to her April 1, 2010 onset date, Degnan received treatment from Gosy and Associates Pain Treatment and Neurology for her chronic back and neck pain.  (Tr. 465-97, 531-55, 594-628).

In March 2010, Degnan began treating with Nurse Practitioner Veronica Mason, who continued to treat Degnan through December 31, 2013, her date last insured. Degnan complained of cervical spine pain that radiates to her shoulders and hands and pain in her lower lumbar spine that radiates to her feet.  Degnan described continuous, aching, stabbing, tender, and penetrating pain with occasional throbbing, shooting, and burning pain.  She rated her pain as a nine out of ten.  Prolonged standing or sitting increased her pain, while medication and a heating pad helped relieve it.  Nurse Mason diagnosed chronic cervical and lumbar radiculopathy and myofascial pain syndrome.  She administered trigger point injections and prescribed a TENS unit, back brace, Lortab, and Zipsor (an anti-inflammatory).  (Tr. 511-13).

At an April 2010 appointment with Nurse Mason, Degnan rated her pain as an eight out of ten but noted that the trigger point injections had reduced her pain somewhat. Nurse Mason added Soma (a muscle relaxer) to Degnan's list of medications.  (Tr. 514). At appointments in May and June 2010, Degnan reported that her back brace was working well and that her TENS unit had significantly helped her pain.  She denied any side effects from her medications and rated her pain as a five or six.  (Tr. 515-16).  In August 2010, Degnan reported that her medications had "helped significantly."  Her pain level was now a five out of ten.  (Tr. 518).  Degnan rate her pain as a five or six at

---

[4]     Degnan testified at the August 3, 2012 hearing that the accidents actually occurred in 1994 and 2001.  (Tr. 902).

appointments in September, October, November, and December 2010. (Tr. 519-22). Nurse Mason noted at the November appointment that Degnan's medications were "working well." (Tr. 521). It was Nurse Mason's impression that Degnan suffers from fibromyalgia. (Tr. 522).

In February 2011, Nurse Mason referred Degnan for physical therapy (Tr. 524), and Degnan received physical therapy from Nancy Ogorek in March and April 2011 (Tr. 661-77). Degnan reported at appointments with Nurse Mason in March and April 2011 that physical therapy was helping, although her pain was still a six or seven. (Tr. 525). Degnan continued to complain of diffuse pain at a level of six out of ten in May, June, July, and August 2011. Nurse Mason noted at these appointments that Degnan's medications were working well. (Tr. 527-30). In September 2011, Degnan complained that her medications were giving her "little relief," that she had "significant" pain in her spine, and that her pain was now a seven or eight. Nurse Mason prescribed Percocet to help reduce the pain. (Tr. 641). Degnan's pain level decreased to a six in October and to a five in November. (Tr. 638, 640).

On December 1, 2011, Degnan visited the Mercy Hospital emergency room complaining of neck pain that may have resulted from sleeping in the wrong position. The hospital staff diagnosed acute myofascial strain and muscle spasm before discharging Degnan with a prescription for Lortab. (Tr. 727-31). At an appointment with Nurse Mason later that month, Degnan reported that she had visited the emergency room for neck pain caused by reaching for a glass in a cabinet. Her pain level was now at a six. (Tr. 654).

In January and February 2012, Nurse Mason noted that Degnan's medications were working well, and Degnan stated that her pain level was a six or seven out of ten.

(Tr. 652-53).  Degnan reported increased pain in March 2012 (Tr. 743), but in June, her medications were working well to help maintain her functional status (Tr. 740).  Degnan consistently rated her pain as a six out of ten between July and December 2012.  (Tr. 775-80).  A cervical spine MRI taken in December 2012 was normal.  (Tr. 842-44).

In January 2013, Nurse Mason again noted that Degnan's medications helped maintain her functional status.  (Tr. 774).  Degnan reported the next month that trigger point injections she had received were "beneficial."  Her pain level was now at a four.  (Tr. 770).  She rated her pain as a five or six in March, April, and May.  (Tr. 767-69).  Degnan's medications and trigger point injections continued to work well in July and August (Tr. 764-65), and in September, her pain level decreased to a four (Tr. 763).  In October 2013, Degnan complained of achy, sharp, and stabbing pain in her head, neck, and spine.  She rated her pain as a four or five.  (Tr. 834-36).  In November 2013, Degnan complained of diffuse pain that improved with medication but became worse with activities and walking.  Her pain was now at a five.  (Tr. 803-05).  Degnan reported the next month that Lortab, Soma, and trigger point injections had helped alleviate her pain, which she now rated as a five or six out of ten.  (Tr. 801-02).

Degnan underwent two consultative examinations in connection with her DIB application.  First, on December 1, 2010, Degnan visited Dr. Samuel Balderman for an internal medicine examination.  Degnan complained of chronic neck and back pain but stated that medications and epidural injections had helped her pain and that she could still cook, shop, and bathe and dress herself.  Upon examination, Degnan appeared to be in no acute distress, and she demonstrated a normal gait and stance.   She could walk on her heels and toes without any difficulty and perform a forty-percent squat.  She did

not need help changing for the exam or getting on and off the exam table, and she could rise from her chair without difficulty.  She demonstrated full flexion, extension, lateral flexion bilaterally, and rotary movement bilaterally in her cervical spine with mild pain. She demonstrated full extension, lateral flexion bilaterally, and rotary movement bilaterally in her lumbar spine, and flexion to forty degrees with poor effort.  Straight leg raising test was negative bilaterally, and she had full range of motion in her upper and lower extremities bilaterally.  Dr. Balderman diagnosed Degnan with cervical and lumbar spine pain, found her prognosis to be "stable," and rendered the following medical source statement:

> The claimant has mild limitations in changes in position of the head.  Mild limitations in bending and lifting due to lumbar pain.  MRI reports should be reviewed for clinical correlation.

(Tr. 498-501).

On September 18, 2012, Degnan visited psychologist Renee Baskin, Ph.D., for an adult psychiatric evaluation.  Baskin diagnosed depressive disorder, anxiety disorder, pain disorder, arthritis, fibromyalgia, and back, neck, and hip pain.  She rendered the following medical source statement:

> The claimant is able to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks with supervision and make appropriate decisions.  Medical/physical problems may interfere with the claimant's vocational functional capacities. . . .  She would have moderate limitations being able to relate with others and deal with stress.  The results of the examination appear to be consistent with psychiatric problems and this may significantly interfere with the claimant's ability to function on a daily basis.

(Tr. 750-756).

B.  *Administrative Hearing Testimony*

Born in 1971, Degnan was forty-two-years old on the day of the hearing.  (Tr. 43).
She worked at Citibank for thirteen years transferring funds, but she stopped working
there in 2008 when her position was outsourced to India.  (Tr. 46, 57, 898-99).  Toward
the end of her time at Citibank, she missed about six to eight days of work a month due
to back and neck pain.  (Tr. 57).  She now spends most of her time at home "just sitting,
standing, [and] walking."  (Tr. 50).  She is able to wash the dishes, do some shopping,
and lift about five to ten pounds.  (Tr. 51).  She lives with her husband and two children.
(Tr. 50).

Degnan testified that she has problems with her neck, hips, back, and knees.  (Tr.
44).  She has pain all over her body and visits a pain management specialist every month
for injections to help treat her pain.  (Tr. 44, 48-49).  She can stand for about fifteen
minutes, and if she takes her medication, she can walk about two blocks and sit for about
thirty to forty minutes before she has to get up and move.  (Tr. 45-46, 50).  Her
medications make her drowsy, however.  (Tr. 47-48).

## DISCUSSION

I.  *Scope of Judicial Review*

The Court's review of the Commissioner's decision is deferential.  Under the Act,
the Commissioner's factual determinations "shall be conclusive" so long as they are
"supported by substantial evidence," 42 U.S.C. §405(g), that is, supported by "such
relevant evidence as a reasonable mind might accept as adequate to support [the]
conclusion," *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks
and citation omitted).  "The substantial evidence test applies not only to findings on basic

evidentiary facts, but also to inferences and conclusions drawn from the facts." *Smith v. Colvin*, 17 F. Supp. 3d 260, 264 (W.D.N.Y. 2014). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force," the Court may "not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002). Thus, the Court's task is to ask "'whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached' by the Commissioner." *Silvers v. Colvin*, 67 F. Supp. 3d 570, 574 (W.D.N.Y. 2014) (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).

Two related rules follow from the Act's standard of review. The first is that "[i]t is the function of the [Commissioner], not [the Court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). The second rule is that "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve." *Veino*, 312 F.3d at 588. While the applicable standard of review is deferential, this does not mean that the Commissioner's decision is presumptively correct. The Commissioner's decision is, as described above, subject to remand or reversal if the factual conclusions on which it is based are not supported by substantial evidence. Further, the Commissioner's factual conclusions, even if supported by substantial evidence, must be applied to the correct legal standard. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). Failure to apply the correct legal standard is reversible error. *Id.*

II.    *Standards for Determining "Disability" Under the Act*

A "disability" is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). The Commissioner may find the claimant disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." *Id.* §423(d)(2)(A). The Commissioner must make these determinations based on "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability, and . . . [the claimant's] educational background, age, and work experience." *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (first alteration in original) (quoting *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)).

To guide the assessment of whether a claimant is disabled, the Commissioner has promulgated a "five-step sequential evaluation process." 20 C.F.R. §404.1520(a)(4). First, the Commissioner determines whether the claimant is "working" and whether that work "is substantial gainful activity." *Id.* §404.1520(b). If the claimant is engaged in substantial gainful activity, the claimant is "not disabled regardless of [his or her] medical condition or . . . age, education, and work experience." *Id.* Second, if the claimant is not engaged in substantial gainful activity, the Commissioner asks whether the claimant has a "severe impairment." *Id.* §404.1520(c). To make this determination, the Commissioner asks whether the claimant has "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."

*Id.* As with the first step, if the claimant does not have a severe impairment, he or she is not disabled regardless of any other factors or considerations. *Id.* Third, if the claimant does have a severe impairment, the Commissioner asks two additional questions: first, whether that severe impairment meets the Act's duration requirement, and second, whether the severe impairment is either listed in Appendix 1 of the Commissioner's regulations or is "equal to" an impairment listed in Appendix 1. *Id.* §404.1520(d). If the claimant satisfies both requirements of step three, the Commissioner will find that he or she is disabled without regard to his or her age, education, and work experience. *Id.*

If the claimant does not have the severe impairment required by step three, the Commissioner's analysis proceeds to steps four and five. Before doing so, the Commissioner must "assess and make a finding about [the claimant's] residual functional capacity ["RFC"] based on all the relevant medical and other evidence" in the record. *Id.* §404.1520(e). RFC "is the most [the claimant] can still do despite [his or her] limitations." *Id.* §404.1545(a)(1). The Commissioner's assessment of the claimant's RFC is then applied at steps four and five. At step four, the Commissioner "compare[s] [the] residual functional capacity assessment . . . with the physical and mental demands of [the claimant's] past relevant work." *Id.* §404.1520(f). If, based on that comparison, the claimant is able to perform his or her past relevant work, the Commissioner will find that the claimant is not disabled within the meaning of the Act. *Id.* Finally, if the claimant cannot perform his or her past relevant work, then at the fifth step the Commissioner considers whether, based on the claimant's RFC, age, education, and work experience, the claimant "can make an adjustment to other work." *Id.* §404.1520(g)(1). If the claimant

can adjust to other work, he or she is not disabled.  *Id.*  If, however, the claimant cannot adjust to other work, he or she is disabled within the meaning of the Act.  *Id.*

The burden through steps one through four described above rests on the claimant. If the claimant carries his burden through the first four steps, "the burden then shifts to the [Commissioner] to show there is other gainful work in the national economy which the claimant could perform."  *Carroll*, 705 F.2d at 642.

III.    *The ALJ's Decision*

The ALJ followed the required five-step analysis for evaluating disability claims. Under step one, the ALJ found that Degnan has not engaged in substantial gainful activity since April 1, 2010, her alleged onset date, through December 31, 2013, her date last insured.  (Tr. 21).  At step two, the ALJ concluded that Degnan has the following severe impairments:  fibromyalgia and depression with anxiety.  (*Id.*).  The Social Security Administration defines fibromyalgia as "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months."  Social Security Ruling ("SSR") 12-2P.  At step three, the ALJ found that Degnan does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  (*Id.*).  Before proceeding to step four, the ALJ assessed Degnan's RFC as follows:

> [T]hrough the date last insured, the claimant had the residual functional capacity to perform light work as defined in [20 C.F.R. §404.1567(b)][5] except she must be able to change positions briefly (one to two minutes) at least every 1/2 hour; no detailed or complex instructions; only simple, repetitive, routine work; no work with the general public; and no more than frequent contact with co-workers or supervisors.

(Tr. 23).  Proceeding to step four, the ALJ found that Degnan is unable to perform her past relevant work as a wire transfer clerk/cash accounting clerk.  (Tr. 29).  At the fifth step, the ALJ considered Degnan's age, education, work experience, RFC, and the testimony of a vocational expert to conclude that she can perform jobs that exist in significant numbers in the national economy.  (Tr. 29-30).  Accordingly, the ALJ found that Degnan can successfully adjust to other work and, therefore, that she has not been under a disability within the meaning of the Act from her alleged April 1, 2010 onset date through her December 31, 2013 date last insured.  (Tr. 30).

IV.    *Degnan's Challenges*

Degnan challenges the Commissioner's disability decision on three grounds:  (1) the ALJ improperly relied upon the normal objective findings in the record to conclude that her statements regarding the intensity, persistence, and limiting effects of her fibromyalgia-related pain "are not entirely credible"; (2) the ALJ mischaracterized the evidence regarding her pain medication; and (3) the "sit stand option" assessed by the ALJ is not supported by substantial evidence.  The Court will address each argument in turn.

---

[5]      "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities."  20 C.F.R. §404.1567(b).

A.  *Credibility*

Degnan first argues that the ALJ improperly relied upon the normal objective findings in the record (*e.g.*, Dr. Balderman's assessment and x-ray records) to conclude that her statements regarding the intensity, persistence, and limiting effects of her fibromyalgia-related pain "are not entirely credible."  (Tr. 24).  According to Degnan, because individuals with fibromyalgia often have normal physical examinations and imaging records, the ALJ should have instead fully credited her subjective complaints of pain and her statements regarding how her pain limits her ability to function.

It is well settled that it is the role of the Commissioner, not the Court, to appraise the credibility of witnesses, including the claimant.  *See Carroll*, 705 F.2d at 642.  "The ALJ is required to evaluate the credibility of testimony or statements about the claimant's impairments when there is conflicting evidence about the extent of pain, limitations of function, or other symptoms alleged."  *Fisk v. Colvin*, No. 14-CV-931S, 2017 WL 1159730, at *5 (W.D.N.Y. Mar. 29, 2017).  The Commissioner has set forth a two-step process to evaluate a claimant's testimony regarding her symptoms.  First, the ALJ must consider whether the claimant has a medically determinable impairment which could reasonably be expected to produce the pain or symptoms alleged by the claimant.  Second, if the ALJ determines that the claimant is so impaired, he must then evaluate the intensity, persistence, and limiting effects of the claimant's symptoms.  If the claimant's statements about her symptoms are not substantiated by objective medical evidence, the ALJ must make a finding as to the claimant's credibility by assessing the following factors:  (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side

effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain.  *See* 20 C.F.R. §404.1529(c)(3)(i)-(vii); SSR 16-3P.[6]

Here, at the first step of the credibility analysis, the ALJ found that Degnan's medically determinable impairments (which include fibromyalgia) could reasonably be expected to cause her alleged symptoms, but at the second step, the ALJ found Degnan's statements concerning the intensity, persistence, and limiting effects of her symptoms to not be entirely credible.  (Tr. 24).  Contrary to Degnan's argument, the ALJ relied upon all the evidence in the record — not just the normal objective findings — in reaching this conclusion.  The ALJ noted, for instance, that Degnan can perform some daily activities, such as cooking, shopping, washing the dishes, and bathing and dressing herself.  (Tr. 21, 24); 20 C.F.R. §404.1529(c)(3)(i).  The ALJ also appropriately considered the location, duration, frequency, and intensity of Degnan's pain by addressing, among other things, her reported pain levels and testimony that she has pain all over her body, a stiff neck, headaches, and problems with her hands and fingers.   (Tr. 24); 20 C.F.R. §404.1529(c)(3)(ii).  The ALJ found that remaining in one position for too long precipitates Degnan's pain (Tr. 24); 20 C.F.R. §404.1529(c)(iii), so in an effort to accommodate any functional limitations and restrictions resulting from remaining in a single position, the ALJ crafted an RFC assessment that allows Degnan to change positions every thirty minutes

---

[6]        SSR 16-3P replaced SSR 96-7P effective March 16, 2016, after Degnan commenced the instant action, but it is still appropriate to evaluate Degnan's credibility using the new ruling.  *See Fisk,* 2017 WL 1159730, at *5 n.5.  Moreover, contrary to Degnan's argument (Dkt. No. 20 at 16), SSR 12-2P does not preclude the ALJ from performing a credibility assessment.  *See* SSR 12-2P.

(Tr. 27); 20 C.F.R. §404.1529(c)(vii).  Turning to Degnan's use of pain medication, the

ALJ thoroughly discussed her medication regimen and how it helps her function.  (Tr. 21,

25-28); 20 C.F.R. §404.1529(c)(iv).  As discussed below, the ALJ's findings regarding

Degnan's pain management are supported by substantial evidence.  *See infra* Point IV.B.

The ALJ also discussed Degnan's use of heat and ice to alleviate her pain and how she

attended physical therapy for a period of time.  (Tr. 24, 26); 20 C.F.R. §404.1529(c)(v),

(vi).  The ALJ's credibility finding does not turn solely upon normal objective findings but

rather rests upon a careful consideration of all the evidence in the record.[7]  Accordingly,

Degnan's first objection to the ALJ's disability decision is without merit.

 B. *Pain Medication*

 Degnan next argues that the ALJ incorrectly concluded that her pain medication

"stabilized" her pain.  According to Degnan, the ALJ's use of the word "stable" indicates

that he believed her to be in "good" condition when in fact her pain left her in poor

condition.  Degnan's argument is belied by the ALJ's finding that Degnan's medications

helped control (not eliminate) her pain.  (Tr. 21, 26-28).  *Cf. Kohler*, 546 F.3d at 268

(finding ALJ erred by interpreting reports that plaintiff had been in "stable" condition to

mean that plaintiff had been in "good" condition).  The ALJ's conclusion that medication

helped control Degnan's pain is supported by Nurse Mason, who found that Degnan's

medications worked well and helped maintain her functional status.  Indeed, Degnan

rated her pain as a nine at her first appointment with Nurse Mason, but after she began

treating with Nurse Mason on a monthly basis, she typically rated her pain as a four, five,

---

[7]     Degnan's reliance on *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003) and *Campbell v. Colvin*, No. 5:13-cv-451(GLS/ESH), 2015 WL 73763, at *11 (N.D.N.Y. Jan. 6, 2015) is misplaced because, unlike the instant action, the disability determination in those cases largely turned upon the lack of objective findings in the record.

or six.  Degnan points to other aspects of Nurse Mason's treatment notes that she believes supports a different disability determination, but it is the role of the ALJ, not the Court, to resolve evidentiary conflicts in the record.  The Court finds that the ALJ appropriately weighed Nurse Mason's notes and the other evidence in the record in concluding that Degnan could perform a range of light work despite her pain.

Degnan also argues that the ALJ incorrectly concluded that her pain level "remained" at a four in 2013.  (Dkt. No. 20 at 20).  This argument is likewise without merit given that Degnan rated her pain as a four in February 2013 and again in September 2013.  To be sure, Degnan did not rate her pain as a four at every appointment she had with Nurse Mason, but the ALJ recognized as much in his decision by referring to appointments at which Degnan rated her pain as a five or six.  (Tr. 25, 26).  Although Degnan's pain level did increase to a ten in December 2011, this was the result of a single episode in which she visited Mercy Hospital after developing neck pain from reaching over her head.  Her pain decreased from a ten to a six shortly after this episode.  Accordingly, the ALJ's findings regarding Degnan's pain medication and pain levels are supported by substantial evidence.

C.  *"Sit Stand" Option*

Degnan's final objection is that the ALJ's "sit stand option" is not supported by substantial evidence.  (Dkt. No. 20 at 23).  Degnan is referring to the ALJ's finding in his RFC assessment that Degnan should briefly change positions at least every thirty minutes.  This finding, which the ALJ made in an effort to accommodate Degnan's pain (Tr. 27), is supported by Degnan's testimony that she has to get up and move every thirty to forty minutes (Tr. 24 (referring to Tr. 45)) as well as her testimony that she spends her

days "just sitting, standing, [and] walking" (Tr. 50).  Therefore, the ALJ's "sit stand option" is in fact supported by substantial evidence.  Degnan's objections to the ALJ's disability decision are without merit.

## CONCLUSION

For the foregoing reasons, it is recommended that Degnan's motion for judgment on the pleadings (Dkt. No. 20) be denied and the Commissioner's motion for judgment on the pleadings (Dkt. No. 23) be granted.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby ORDERED that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Vilardo, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and Local Rule of Civil Procedure 72. Any requests for an extension of this deadline must be made to Judge Vilardo.

***Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.***  *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law, and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance.  *See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988).

Pursuant to Local Rule of Civil Procedure 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with these provisions may result in the District Court's refusal to consider the objection.**

**SO ORDERED.**

Dated:        October 13, 2017
              Buffalo, New York

                                          /s/ Michael J. Roemer
                                          MICHAEL J. ROEMER
                                          United States Magistrate Judge